# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# COLUMBIA DIVISION

|  |  |
|---|---|
| Donaji Cruz Lopez, ) | |
| ) | Civil Action No. 3:18-cv-03459-JMC |
| Plaintiff, ) | |
| ) | **ORDER** |
| v. ) | |
| ) | |
| Pennsylvania Tool Sales & Service, Inc., ) | |
| ) | |
| Defendant. ) | |
| ) | |

This action arises from a motor vehicle collision on January 11, 2018. (ECF No. 1 at 2 ¶ 5.) The matters before the court are Plaintiff's Motion for Damages Hearing and Motion for Default Judgment. (ECF No. 12.) On March 6, 2019, the clerk of court made entry of default as to Defendant Pennsylvania Tool Sales & Service, Inc. ("Defendant Pennsylvania Tool") (ECF No. 11.) On the same day, Plaintiff filed a Motion for Damages Hearing and Default Judgment. (ECF No. 12.) The court held a hearing to determine the appropriate amount of damages on June 21, 2019. (ECF No. 17.) However, Defendant Pennsylvania Tool did not appear.

The court has subject matter jurisdiction over Plaintiff's claims based on diversity of citizenship. *See* 28 U.S.C. § 1332(a)(1). Plaintiff is a resident of Lexington County, South Carolina. (ECF No. 1 at 1.) Defendant Pennsylvania Tool is a foreign corporation organized and existing under the laws of a state other than the State of South Carolina. (ECF No. 1 at ¶ 2.) In her Complaint, Plaintiff claims damages in excess of $75,000.00. Thus, the court is satisfied that Plaintiff has met the jurisdictional requirements in Section 1332(a)(1).

Venue is proper under 28 U.S.C. § 1391(b)(2) and Local Civil Rule 3.01(A)(1) (D.S.C.) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Columbia Division of the United States District Court for the District of South Carolina.

Plaintiff brings this negligence action against Defendant Pennsylvania Tool based on a motor vehicle collision that occurred in Lexington County, South Carolina. Plaintiff presented evidence regarding the injuries and damages that she sustained as a result of the collision. Plaintiff offered thirteen (13) exhibits into evidence, including affidavits from Robbie Schadewald, Plaintiff's previous employer, Dr. Jason Highsmith, one of Plaintiff's treating providers, and Dr. Charles Alford, an economist who provided reports related to Plaintiff's lost income and future medical expenses. Plaintiff and her husband, Saturnino Zepeda, were also present at the hearing and gave testimony regarding the injuries she suffered because of the collision and how her injuries have affected her life.

Having considered the pleadings, evidence, and arguments, the court issues the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent any findings of fact constitute conclusions of law, they are adopted as such; to the extent any conclusions of law constitute findings of fact, they are so adopted.

## I. FINDINGS OF FACT

A. <u>Parties</u>

1. Plaintiff is a resident of Lexington County, South Carolina. She is 31 years old. (ECF No. 1 at ¶ 1.)

2. Defendant Pennsylvania Tool is a foreign corporation organized and existing under the laws of a state other than the State of South Carolina. Defendant Pennsylvania Tool transacts business in South Carolina and is registered to do business in this State. (ECF No. 1 at ¶ 2.)

3. The vehicle involved in the collision with Plaintiff was a commercial vehicle owned by, and driven on behalf of, Defendant Pennsylvania Tool. (ECF No. 1 at ¶ 7.)

B. Collision

4. This motor vehicle collision occurred in Lexington County, South Carolina. (ECF No. 1 at ¶ 5.)

5. On January 11, 2018, Plaintiff was lawfully driving her Toyota Camry on US-21/Charleston Highway in a northbound direction. (ECF No. 1 at ¶ 6.)

6. A commercial vehicle owned by, and driven on behalf of, Defendant Pennsylvania Tool was also traveling on US-21/Charleston Highway in a northbound direction. (ECF No. 1 at ¶ 7.)

7. In preparing to make a left-hand turn, Plaintiff put on her turn signal and slowed down. Because of traffic on Charleston Highway that day, she had to come to a stop on the Highway.

8. The driver of the commercial vehicle owned by Defendant Pennsylvania Tool ("PTSS Driver") was driving too fast for conditions and struck the rear of Plaintiff's vehicle. (ECF No. 18-12 at 1.)

9. Plaintiff was unable to get out of her car without assistance. She borrowed a phone to call her family.

10. The force of the collision was violent and significant, resulting in substantial property damage to Plaintiff's vehicle as depicted in the photographs presented to the court. (ECF No. 18-11.)

11. Plaintiff did not cause or contribute to the collision in any manner, and further, she had no ability to avoid or prevent the collision. (ECF No. 18-12 at 1.)

12. PTSS Driver breached his common law and statutory duties to other drivers on the highway, including Plaintiff. PTSS driver was negligent, negligent per se, and grossly negligent in causing the collision.

13. PTSS Driver was acting in the course and scope of his employment with Defendant Pennsylvania Tool at the time of the collision, and therefore, Defendant Pennsylvania Tool is liable to Plaintiff for his negligence. (ECF Nos. 1 at ¶ 7; 18-12); *Lane v. Modern Music, Inc.*, 136 S.E.2d 713, 716 (1964).

14. Plaintiff suffered bodily injuries as a direct and proximate result of Defendant Pennsylvania Tool's vehicle colliding with her vehicle.

15. The court finds that Plaintiff's allegations, taken as true, establish Defendant Pennsylvania Tool's liability for Plaintiff's injuries.

C. <u>Injuries and Medical Treatment</u>

16. Immediately following the collision, Lexington County Emergency Medical Services took her to Lexington Medical Center by ambulance. The emergency room performed several diagnostic tests and treated her for the pain she was experiencing.

17. In the days following the collision, Plaintiff suffered increased back pain, neck pain, severe headaches, and continued pain in her right leg and right arm/shoulder.

18. Plaintiff sought treatment with Spine Centers of South Carolina on January 18, 2019, and the treatment notes indicate that she complained of constant pain in her neck and head, as well as frequent pain in her back and right leg. (ECF No. 18-6 at 14–15.) The Chiropractor's evaluation revealed severe limitations in Plaintiff's cervical and thoracic range of motion, and Plaintiff's functional movements were notably hindered. (ECF No. 18-6 at 16–17.)

19. Plaintiff treated with Spine Centers for approximately (3) three months. Although Plaintiff improved slightly with chiropractic treatment, she continued to have severe pain in her cervical spine, which extended to her right upper extremity, as well as moderate pain in her thoracic

spine and headaches. (ECF No. 18-6 at 22–23.) She was referred to Dr. Jason Highsmith of Carolina Neurosurgery and Orthopedics for further evaluation.

20. Plaintiff began treatment with Dr. Jason Highsmith of Carolina Neurosurgery and Orthopedics on February 14, 2018.

21. Dr. Highsmith testified, via affidavit, that Plaintiff sustained permanent injuries to her lumbar, thoracic, and cervical spine, as well as her right shoulder. He further opines that she is permanently disabled because of these injuries and will not be able to return to gainful employment. His opinions are to a reasonable degree of medical certainty. (ECF No. 18-3 at ¶¶ 4, 8.)

22. Dr. Highsmith's notes indicate that Plaintiff suffers from right upper extremity radiculopathy, meaning the symptoms in her right shoulder/arm stem from the injury to her spine. (ECF No. 18-3.)

23. Plaintiff continually tried to utilize conservative treatment options to manage her pain, but she had little to no success. Plaintiff's injuries required a C5-6 Anterior Cervical Discectomy and Arthroplasty, which Dr. Highsmith performed in September 2018. (ECF No. 18-3 at ¶ 5.)

24. In addition to having surgery, Plaintiff had to undergo various injections in both her cervical and thoracic spine because of this collision. (ECF No. 18-3 at ¶ 6.)

25. The surgery and injections provided Plaintiff some relief, and the constant pain in her right arm/shoulder became intermittent. However, the surgery did not resolve the pain, and the relief she felt from the injections was temporary. (ECF No. 18-3.)

26. Dr. Highsmith referred Plaintiff to Carolina's Center for Advanced Management of Pain for management of the chronic pain she suffers because of her injuries. (ECF No. 3.)

27. Plaintiff began treating with Dr. Justin Hutcheson of Carolina's Center for Advanced Management of Pain on December 17, 2018 for neck and right arm pain. Dr. Hutcheson recommended physical therapy and epidural steroid injections in the cervical spine and deferred to Dr. Loging (Palmetto Bone and Joint) for treatment specific to her right shoulder. (ECF No. 18-6 at 40.) Plaintiff has received at least one injection so far and continues to use oral medications to manage her pain as well.

28. As referenced above, Plaintiff suffers ongoing pain in her right shoulder/arm, even after receiving treatment for her cervical spine. On December 6, 2018, she began treating specifically for her shoulder at Palmetto Bone and Joint, and Dr. Loging determined that the issues with her cervical spine are causing the pain in her right shoulder/arm. (ECF No. 18-6 at 31–32.) Dr. Loging notes that although the cervical spine surgery helped some, Plaintiff continues to have neck pain that radiates into her face and right shoulder/arm. (ECF No. 18-6 at 29, 31.) Her symptoms have progressed to the point that she has lost part of her vision in her right eye. (ECF No. 18-6 at 34.)

29. Dr. Loging's notes indicate that Plaintiff will most likely require ongoing epidural injections for her shoulder until she has an additional neck surgery at some point in the future. He also notes that he believes her symptoms are directly related to the injuries she incurred in the motor vehicle collision. (ECF No. 18-6 at 34–35.)

30. Plaintiff also sought an additional opinion from Dr. Steven Poletti at Southeastern Spine Institute. Dr. Poletti evaluated Plaintiff on January 10, 2019, and his report indicates that he agrees with the recommendations of Dr. Highsmith, Dr. Loging, and Dr. Hutcheson, including the recommendations for ongoing facet injections and rhizotomy. He also agreed that Plaintiff was at risk for requiring a cervical spine fusion from C4 through C7 and determined that her injuries have resulted in a 25% impairment to the whole person. (ECF No. 18-14.)

31. Most recently, on March 8, 2019, Plaintiff underwent a radiofrequency ablation procedure, also referred to as rhizotomies, where she was sedated, and Dr. Highsmith inserted ten 22-guage needles into her neck and back. (ECF No. 18-10.) A radiofrequency current was administered via the needles, with the goal of burning or severing the nerve roots in the spinal cord, alleviating pain. (ECF No. 18- 3.) Plaintiff again experienced some relief of symptoms from this procedure, but her pain has not resolved.

32. On March 27, 2019, Plaintiff began physical therapy for her neck and upper extremities. The goal is to work on functional movements, increase strength, and improve range of motion to allow Plaintiff to bathe herself, dress, and drive independently. Plaintiff's providers also hope the therapy will decrease pain in the neck, head, and upper extremities, and help her to sleep. (ECF No. 18-6 at 46–48.) Although she took a break from physical therapy based on the recommendation of the physical therapist, after discussing it with her doctors, she will continue physical therapy. Plaintiff testified that she is currently in physical therapy three times a week.

33. On March 29, 2019, Plaintiff began treating at Midlands Psychiatric, primarily because of general anxiety and trouble sleeping. She awakens with neck pain and has trouble falling asleep again, often being unable to find a comfortable position. (Plaintiff's Testimony). Plaintiff has also addressed with her therapist: difficulty concentrating, feeling very upset when reminded of the collision, frustration with her ongoing pain, nervous anxiety, inability to stop worrying about memories of the collision, worry over financial obligations and the inability to work, being restless and anxious because of her physical limitations in completing household tasks, being irritable and easily annoyed, and continually anticipating that something devastating will happen again. The therapist has encouraged Plaintiff to try to restructure her thinking and focus on a positive attitude and helpful thoughts, as well as learning to be patient and accepting of herself. Plaintiff indicates

that she attempts to reduce her negative thoughts by thinking of something positive. (ECF No. 18-6 at 57–61.)

34. Plaintiff has also treated with Dr. Angela Ashley of Restoration Neurology for headaches, cognitive disturbance, memory loss, vertigo, tinnitus and anxiety. Dr. Ashley performed cognitive testing, which showed impaired psychomotor speed, reaction time, complex attention, cognitive flexibility, and executive function, as well as evidence of depression and anxiety. Dr. Ashley notes that these symptoms are consistent with post-concussion syndrome. (ECF No. 18-6 at 63, 68.) Dr. Ashley prescribed Gabapentin for headaches, Wellbutrin for mood disturbance, and a Scopolamine Transdermal Patch for vertigo, along with making other recommendations. However, Plaintiff had to discontinue the patch because of side effects and is now trying a new medication, Meclizine. (ECF No. 18-6 at 65, 75.)

35. In addition to the medical treatment Plaintiff has already received, Dr. Highsmith testified that Plaintiff will most probably, to a reasonable degree of medical certainty, require additional treatment in the future, including pain management appointments, injection therapy, radiofrequency ablations, continued medications, and a cervical fusion surgery. (ECF No. 18-3 at ¶ 7.)

## II. CONCLUSIONS OF LAW

A. Default Judgment

36. "Upon the entry of default, the defaulted party is deemed to have admitted all well-pleaded allegations of fact contained in the complaint." *Ryan v. Homecomings Fin. Network*, 253, F.3d 778, 780 (4th Cir. 2001) (citations omitted); *see also* Fed. R. Civ. P. Rule 8(b)(6) ("An allegation – other than one relating to the amount of damages – is admitted if a responsive pleading is required and the allegation is not denied.")

37. "[T]he defendant is not deemed to have admitted conclusions of law and the entry of 'default is not treated as an absolute confession by the defendant of his liability and of the plaintiff's right to recover.'" *Id.*

38. "[T]he Fourth Circuit [Court of Appeals] has 'repeatedly expressed a strong preference that, as a general matter, defaults be avoided and that claims and defenses be disposed of on their merits.'" *Id.* (citing *Colleton Preparatory Acad., Inc. v. Hoover Univ., Inc.*, 616 F.3d 413, 417 (4th Cir. 2010) (citations omitted)).

39. "[D]efault judgment 'may be appropriate when the adversary process has been halted because of an essentially unresponsive party.'" *Id.* (citing *SEC v. Lawbaugh*, 359 F. Supp. 2d 418, 421 (D. Md. 2005)).

B. <u>Negligence</u>

40. "To prove a cause of action for negligence, a plaintiff must show: (1) the defendant owes a duty of care to the plaintiff; (2) the defendant breached that duty by a negligent act or omission; (3) the defendant's breach was the actual and proximate cause of the plaintiff's injury; and (4) the plaintiff suffered an injury or damages." *Roddey v. Wal-Mart Stores E., LP*, 784 S.E.2d 670, 675 (2016).

41. "In a negligence action, the court must determine, as a matter of law, whether the defendant owed a duty of care to the plaintiff." *Huggins v. Citibank, N.A.*, 585 S.E.2d 275, 276 (2003). In South Carolina, a motorist has a common law "duty to keep a reasonable lookout to avoid hazards on the highway." *Thomasko v. Poole*, 561 S.E.2d 597, 599 (2002). "A person shall not drive a vehicle on a highway at speed greater than is reasonable and prudent under the conditions and having regard to the actual and potential hazards then existing." S.C. Code Ann. § 56-5-1520(A) (2012).

C. <u>Damages</u>

42. "Once liability is established, the [c]ourt must then determine damages." *J&J Sports Prods., Inc. v. Romenski*, 845 F. Supp. 2d 703, 706 (W.D.N.C. 2012).

43. In South Carolina, "the trial judge has considerable discretion regarding the amount of damages, both actual and punitive." *Austin v. Specialty Transp. Servs., Inc.*, 594 S.E.2d 867, 874 (S.C. Ct. App. 2004).

44. Plaintiff seeks actual damages, consequential damages, and punitive damages. (ECF No. 1 at 5.) In an action for negligence, a plaintiff is allowed to recover "actual or compensatory damages . . . the goal of compensatory damages is to restore the injured party, as nearly as possible through the payment of money, to the same position he or she was in before the wrongful injury occurred." *Clark v. Cantrell*, 529 S.E.2d 528, 533 (S.C. 2000).

45. Actual damages "are awarded to a litigant for his actual loss or injury . . . compensatory damages include compensation for all injuries which are naturally the proximate result of the alleged wrongful conduct of the defendant." *Austin*, 594 S.E.2d at 874.

46. "When the damages amount is not a sum certain, the [c]ourt may convene an evidentiary hearing or simply rely on affidavits or other documentary evidence in the record to determine the appropriate sum." *Id.* at 706.

47. "In a personal injury action, the plaintiff must recover for all injuries, past and prospective, which arose and will arise from the defendant's tortious activity." *Haltiwanger v. Barr*, 186 S.E.2d 819, 821 (1972). "Thus, recovery must be had for future pain and suffering, and for the reasonable value of medical services and impaired earning capacity, to the extent that these injuries are reasonably certain to result in the future from the injury complained of." *Id.; see also Watson v. Wilkinson Trucking Co.*, 136 S.E.2d 286, 291 (1964) (stating a plaintiff is "entitled to

recover all damages proximately resulting from the negligent acts of the defendantl," including "his loss of earning power, pain and suffering, and medical expenses, including any future damages resulting from permanent injuries"). The monetary value to assign a plaintiff's damages is "a matter resting within the sound judgment of the" fact-finder. *Id*.

48. "An award for pain and suffering compensates the injured person for the physical discomfort and the emotional response to the sensation of pain caused by the injury itself." *Boan v. Blackwell*, 541 S.E.2d 242, 244 (2001). "Pain and suffering have no market price. They are not capable of being exactly and accurately determined, and there is no fixed rule or standard whereby damages for them can be measured." *Harper v. Bolton*, 124 S.E.2d 54, 57 (1962). "Separate damages are given for mental anguish where the evidence shows, for example, that the injured person suffered shock, fright, emotional upset, and/or humiliation as the result of the defendant's negligence." *Boan*, 541 S.E.2d at 244.

49. "[D]amages for 'loss of enjoyment of life' compensate for the limitations, resulting from the defendant's negligence, on the injured person's ability to participate in and derive pleasure from the normal activities of daily life, or for the individual's inability to pursue [her] talents, recreational interests, hobbies, or avocations." *Boan*, 541 S.E.2d at 244.

50. "Loss or impairment of earning capacity resulting from personal injuries is a proper element of compensation." *Doremus v. Atl. Coast Line R. Co.*, 130 S.E.2d 370, 382 (1963).

51. A plaintiff may also recover damages for permanent physical scarring. *Howle v. PYA/Monarch, Inc.*, 344 S.E.2d 157, 165 (S.C. Ct. App. 1986).

52. Plaintiff has a life expectancy of 50.6 years from today's date based on the South Carolina Life Expectancy tables. S.C. Code Ann. § 19-1-150 (1962). A fact-finder may properly

consider the South Carolina Life Expectancy Tables in a personal injury action where there is evidence of permanent injury. *Abofreka v. Alston Tobacco Co.*, 341 S.E.2d 622, 625 (1986).

53. Plaintiff testified that she did not suffer from neck pain, headaches, upper back pain, pain in her right arm/shoulder, right leg pain, vertigo, tinnitus, depression, or anxiety prior to this collision. Robbie Schadewald, her former employer, also testified that he knew her to be a healthy person and never heard her complain of neck or shoulder pain prior to the collision. (ECF No. 18-13.) Mr. Zepeda testified that she did lots of things around the house, including housework and activities with her daughter, but since the collision, she is inactive and always complaining about different pains.

54. Because of the injuries she has sustained in this collision, Plaintiff is no longer able to work. Dr. Highsmith indicated that, to a reasonable degree of medical certainty, Plaintiff's injuries will permanently prevent her from obtaining gainful employment. (ECF No. 18-3 at ¶ 8.) Plaintiff previously worked as a seamstress, repairing upholstery on pontoon boats, and she took great pride in her work. In addition, Plaintiff has been unable to contribute to household tasks such as washing dishes, cleaning, and caring for her pre-teen daughter because of her chronic pain. She is not able to independently care for herself, and requires assistance with dressing, washing her hair, and washing her back. Because she is fearful of driving and using her arms causes her discomfort, Plaintiff has seldomly driven since the collision occurred and relies on family members and friends to get her to her medical appointments. Her husband has missed work frequently since this collision to take her to doctors when needed. Plaintiff suffers from anxiety and depression because of her physical pain and limitations. Her condition prevents Plaintiff from helping her daughter with homework, participating in activities at her school, and joining in fun activities such as trick-or-treating, all of which she did frequently before the collision. She worries that something else

devastating will happen to her family. She has a visible scar on her neck from the surgery that was necessitated because of this collision.

55. Plaintiff has shown by a preponderance of the evidence that she has suffered significant pain in the seventeen (17) months since this collision occurred. The collision has caused sleep disturbances, stress, anxiety, scarring on the neck. Because of this collision, Plaintiff has been unable to work, to maintain her independence, care for herself or her child, or to participate in things that brought her joy and satisfaction prior to this collision occurring. Because her injuries are permanent, Plaintiff is reasonably certain to continue suffering these ill effects in the future. Additionally, Plaintiff has expected future medical treatment, such as surgeries and injections, that will necessitate further pain and suffering.

56. The elements that are properly considered in determining the amount of actual damages for personal injury include medical expenses, pain and suffering, loss of income and earning power, and loss of enjoyment of life. *See Schumacher v. Cooper*, 850 F. Supp. 438, 453 (D.S.C. 1994).

57. Mathematical precision is not required when measuring damages for pain and suffering. *See Schumacher*, 840 F. Supp. at 454. Using a per diem formula that is permitted in South Carolina courts, *see e.g. Edwards v. Lawton*, 136 S.E.2d 708, 711 (S.C. 1964), the court awards Plaintiff ($500,000.00) for past and future pain and suffering. (ECF Nos. 18-2 at 17; 18-3 at 40; 18-4 at 1; 18-5 at 1; 18-6 at 3-12; 18-7 at 1-18.)

58. Damages for loss of enjoyment of life are separate from pain and suffering and compensate for limitations from normal activities of daily life. *See Boan*, 541 S.E.2d 242. Based on the evidence and testimony above, the court awards ($1,120,000.00) in damages to Plaintiff for loss of enjoyment of life. (ECF Nos. 1; 18-2 at 17; 18-4 at 1; 18-5 at 1; 18-6 at 3-12; 18-7 at 1-18.)

59. The testimony presented to the court in the damages hearing supports an award of ($200,000.00) for the mental anguish Plaintiff suffered as a result of the collision. *See Boan*, 541 S.E.2d at 244.

60. Plaintiff has submitted an uncontested loss summary that shows health care expenses of ($226,306.99) (ECF No. 18-5) that are reasonable and necessary as a direct and proximate result of injuries received in the collision.

61. Robbie Schadewald, Plaintiff's employer of fifteen (15) years, submitted an affidavit indicating that Plaintiff can no longer meet the physical demands of her job as a marine upholsterer. He indicated she was an excellent employee, very kind and polite, and one of the hardest working people he has known. (ECF No. 18-13.)

62. At the time of the collision, Plaintiff was making a base hourly rate of ($17.00) per hour and typically worked more than fifty (50) hours per week. (ECF No. 18-13.) Forty (40) hours of work at this base rate of pay, plus ten (10) hours per week at one- and one-half times the base pay, for fifty (50) weeks of work per year, would result in an annual income of ($46,750.00).

63. Based on her 2016 gross earnings of ($36,826.00)[1], Dr. Charles Alford, Ph.D., an economist, calculated Plaintiff's lost earnings based on her inability to work following the collision. His calculations assume that Plaintiff would have worked until the age of 67. Based on this information, Dr. Alford calculated that Plaintiff has suffered lost earnings of ($1,382,230.00).[2] This amount does not account for merit raises or employee benefits. (ECF No. 18-2.)

64. Additionally, based on Dr. Highsmith's recommendations for future medical treatment, Dr. Alford prepared a report concluding that the present value of the future medical costs Plaintiff

---

[1] The court notes that this amount is approximately ($10,000) less than the annual income estimate provided by Plaintiff's employer for 2017.
[2] Dr. Alford discounted future earnings to present value.

will require is in the range of ($2,261,262.00) to ($3,275,741.00). The reason for the range is that some of Dr. Highsmith's recommendations provide a range for the frequency of when the treatments will be needed. Neither the high nor low estimates provided by Dr. Alford include additional physical therapy, additional psycho-therapy, or recommendations from Plaintiff's other treating physicians. (ECF No. 18-2.)

65. Therefore, based on the evidence presented, and proven by a preponderance of the evidence, the court will award Plaintiff damages in the amount of ($6,718,677.99). Plaintiff's compensatory damages include: pain and suffering ($500,000.00); loss of enjoyment of life ($1,120,000.00); mental anguish ($200,000.00). Plaintiff's actual damages include: past medical costs ($226,306.99) (ECF No. 18-5 at 1); future medical costs ($3,275,741.00) (ECF No. 18-2 at 2 ¶ 2); and lost wages and earnings ($1,382,230.00) (ECF No. 18-2 at 14-15). The court awards ($0.00) in punitive damages.[3]

---

[3] In her Complaint, Plaintiff alleges that "a commercial vehicle owned by, and driven on behalf of, [Defendant Pennsylvania Tool] was driving in a distracted and reckless manner and too fast for conditions," before colliding with her car, thereby prompting an award of punitive damages. (ECF No. 1 at 2, 5.) "Punitive damages are recoverable in a negligence cause of action when a defendant's conduct rises to the level of a willful, wanton, or malicious violation of the plaintiff's rights. A conscious failure to exercise due care constitutes willfulness." *Scott by McClure v. Fruehauf Corp.*, 396 S.E.2d 354, 357 (S.C. 1990) (internal and external citations omitted). In South Carolina, punitive damages are recoverable and "serve at least three important purposes: (1) punishment of the defendant's reckless, willful, wanton, or malicious conduct; (2) deterrence of similar future conduct by the defendant or others, and (3) compensation for the reckless or willful invasion of the plaintiff's private rights." *Austin*, 594 S.E.2d at 874-75 (citation omitted). "The plaintiff bears the burden of proving punitive damages by clear and convincing evidence." *Sams v. Heritage Transp., Inc.*, No. 2:12-cv-00465-DCN, 2012 WL 2092149, at *3 (D.S.C. June 11, 2012) (citing S.C. Code Ann. § 15-33-135 (2019)). Plaintiff alleges that PTSS Driver's conduct was reckless, willful, or wanton. (ECF No. 1 at 2 ¶ 9.) However, the "Traffic Collision Report Form" does not provide factual support for Plaintiff's allegation of reckless, willful, or wanton conduct. (ECF No. 18-12 at 1-3.) The report provides a general description of how the accident occurred: "Units 1 and 2 were traveling north on US 21. Unit 1 stopped due to traffic. Unit 2 driving too fast for conditions struck Unit 1 in the rear." (*Id.* at 1.) The report also cites a statute that provides: "A person violating the speed limits established by this section is guilty of a misdemeanor . . . ." S.C. Code Ann. § 56-5-1520 (2006) ("General rules as to maximum speed

### III. CONCLUSION

Based on the foregoing, the court **GRANTS** Plaintiff's Motion for Default Judgment against Defendant Pennsylvania Tool Sales & Service, Inc., in the amount of ($6,718,677.99) in damages, plus prejudgment and post-judgment interest at the applicable rate.

**IT IS SO ORDERED.**

*J. Michelle Childs*
United States District Judge

September 5, 2019
Columbia, South Carolina

---

limits; lower speed limits may be required"). Due the general description of the accident and the minor nature of the statutory violation, the court finds that punitive damages are not warranted. *Cf. Wise v. Broadway*, 433 S.E.2d 857, 859 (S.C. 1993) ("Violation of a statute does not constitute recklessness, willfulness, and wantonness *per se*, but is some evidence that the defendant acted recklessly, willfully, and wantonly . . ."). Plaintiff also testified that PTSS Driver allegedly approached her after the collision and said, "I'm sorry. I was drinking," or words to that effect. Under the Federal Rules of Evidence, this statement, even if relevant, constitutes "hearsay," which is a statement – an oral assertion, written assertion, or nonverbal conduct – that the declarant does not make while testifying at the current trial or hearing; and a party offers in evidence to prove the truth of the matter asserted in the statement. Fed. R. Evid. 801(c). For the statement to have any evidentiary value, an exception to the hearsay rule must apply. Under Rule 801(d)(2), a statement is not hearsay when it "is offered against an opposing party and it was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2). The citation does not corroborate Plaintiff's statement. (ECF No. 18-12 at 1-3.) Therefore, the court concludes that it cannot impose punitive damages on Defendant Pennsylvania Tool because PTSS Driver was cited for a misdemeanor and his alleged statement is not corroborated nor an allegation in the Complaint.